**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Cr. No. 06-CR-102 (JDB)** |
| | ) | |
| ZION CLARKE, *et. al.* | ) | |
| Defendant | ) | |

<u>**REPLY TO OMNIBUS OPPOSITION OF THE UNITED STATES TO DEFENDANTS'**</u>
<u>**POST-TRIAL MOTIONS**</u>

## I.  INTRODUCTION

The 169 page Omnibus Opposition of the United States to Defendants' Post-Trial Motions

("Omnibus Opposition") does not effectively counter the arguments put forth in Clarke's Motion

for New Trial.  The government's Omnibus Opposition's counter arguments are unpersuasive

and at times incorrect.  The exclusion of evidence from the defense regarding Mr. Maharaj's

citizenship was error because challenging the government's evidence in a criminal case does not

affect the exclusive avenue for revocation of citizenship outlined in 8 U.S.C. § 1451.  The Jencks

and *Brady* violations committed by the government throughout the trial are listed here, and

cumulatively, warrant the grant of a new trial.  Defendant Clarke suffered prejudice by the

joinder of his trial with co-defendants and introduction of statements by the co-defendants that

were not sufficiently redacted.  The evidence regarding the dismemberment and the evidence of

other crimes introduced against Defendant Clarke was unduly prejudicial.   Finally, the

government's comments during closing and rebuttal arguments constituted impermissible

vouching for witnesses.  The Court should grant Clarke's Motion for New Trial for the reasons

stated therein and in this Reply.

## II.  CITIZENSHIP

Regarding the issue of whether it was error for the Court to prevent presentation by the defense of evidence related to Mr. Maharaj's application for citizenship, the government unpersuasively and incorrectly argues that Clarke's Motion for New Trial "fails to identify any legitimate flaw in the Court's reasoning or conclusions when it twice previously rejected his arguments" and cites to the Court's orders on May 8, 2009 [Doc. 465] and July 2, 2009 [Doc. 576]. In Clarke's Motion for New Trial, Defendant argues that the existence of an exclusive avenue for revoking citizenship pursuant to 8 U.S.C. § 1451 does not mean that the evidence cannot be put on in a criminal case to confront and challenge the government's evidence and burden. Clarke's Motion for New Trial, 10-13. Clarke's Motion for New Trial specifically distinguished cases cited by the Court in Doc. 465 – *United States v. Anton,* 546 F.3d 1355 (11th Cir. 2008) and *United States v. Scheffer,* 523 U.S. 303, 308 (1998) on pages 7-8 of the pleading. Furthermore, additional cases were cited and arguments made regarding errors in the Court's reasoning. Clarke's Motion for New Trial argues that the Court's reasoning that "there is no right to present evidence to the jury on questions that are reserved for the Court to resolve, including legal questions, and indeed that have already been resolved," was error in light of the holding in *United States v. Smith-Baltiher*, 424 F.3d 913 (9th Cir. 2005) that allowing a criminal defendant the opportunity to challenge citizenship evidence did not affect the determination of citizenship in an immigration context. Clarke's Motion for New Trial, 10-13.

The government also argues in response to Mr. Pierre's claims that the "Court did allow the defendants to question the Government's witnesses as to whether or not the Government had actually made a decision to permit the victim to become a naturalized United States citizen and whether or not the victim actually became a United States citizen and whether or not the United States Government had actually made a determination to issue the victim a United States

passport and whether or not the United States Government had actually issued the victim a United States passport." Omnibus Opposition, 72.    Notably, the government did not include transcript cites to these permitted lines of questioning.    At a bench conference during Ms. Grant's testimony, the Court foreclosed questioning that would have put before the jury evidence that there was fraud in Mr. Maharaj's naturalization application.  Trial Tr. 166:6-177:11 (May 27, 2009, afternoon).  With regard to the questioning that was permitted, it was insufficient to challenge the government's evidence regarding citizenship.  As the Court noted, "You can do that, but that's not going to get you anywhere unless you can do more through other witnesses." Trial Tr. 168:24-25 (May 27, 2009, afternoon).

## III.  JENCKS/BRADY

The government complains that instead of listing each of its violations of the Court's order regarding Jencks and its obligations under *Brady,* that Clarke's Motion for New Trial, while preserving objections and arguments as to all violations, used examples to illustrate its arguments.  In response to the government's complaint that its violations are not specifically enumerated, each violation is listed below.  The government next argues that three events do not generally constitute *Brady* violations:  (1) delayed disclosure instead of complete suppression, (2) cumulative impeachment, and (3) delayed disclosures that would have affected trial preparation, strategy and tactics.    Couching its argument by stating these events do not "generally" constitute *Brady* violations was wise since each event can constitute a *Brady* violation and the violations in this case were not general, as set out below.  Below is also an analysis of the prejudice caused by each of the delayed disclosures.

Special attention is needed for the government's arguments regarding the false campsite issue.  Defendant Clarke states that Clarke's Motion for New Trial does not argue that he did not

know the campsite was false and to the extent it does, such argument is withdrawn. The argument that was actually made in Clarke's Motion for New Trial and being pursued in this Reply is that the government was obligated to turn over documentary evidence that supported the fact that the campsite was false, and that obligation exists immaterial of Clarke or counsel's knowledge of the underlying fact. The government's argument is, essentially, that because defendant himself knew of the fact of the false campsite, that knowledge relieved the government of its obligation to produce other evidence which supported that fact; this argument is akin to saying that a defendant who knows he is innocent is not entitled to the government's evidence of that innocence, an argument which directly contradicts *Brady*. The government has and continues to offer excuses for its failures, but the excuses indicate a misunderstanding of *Brady* and reflect recklessness, if not bad faith.[1]

### A.  List of Government's Failures to Disclose Material

Below are incidences throughout the trial in which the Court admonishes the government on its disclosure decisions and/or in which it was discovered that the government had failed to make timely disclosures of information to the defense:

(1) On Wednesday, May 27, 2009, the Court instructed the government to disclose Jencks material so the defense had two nights to review it prior to the witness's testimony. "THE COURT: To the extent that you can make it easy on yourself and counsel by doing a whole batch that may cover four or five days, I would encourage you to do that. But my

---

[1] The government persistently in its Omnibus Opposition offers as an excuse for failing to produce Jencks and *Brady* documents that there was "a last-minute moving of offices to effect a re-painting and re-carpeting regime at the United States Attorney's Office, during which support staff mistakenly separated the consolidated files relating to Agent Clauss which resulted in a mistaken belief by the Government's trial counsel that all volumes of Agent Clauss [sic] four appearance [sic] before the Grand Jury had been provided, when some of them had not." Omnibus Opposition, 47 n.33, and see 38 n.22, 51 n.38, 121 n.76, 124  One of the references is to the failure to disclose Josephs January 17, 2006 statement.  The government's excuse strikes a sour note since it is almost inconceivable that the government did not have a master list of materials in their possession against which they could check to see whether they had disclosed all the materials or not.

requirement is that they have two nights with the material before the witness is on the stand." Trial Tr. 228:5-9 (May 27, 2009, afternoon).

(2) On Thursday, May 28, 2009, upon objection by Mssrs. Donahue and Brodnax, the government produced an unredacted copy of handwritten notes for Agent Clauss regarding the Rule 15 witness deposition of Zyroon Gajadhar. Though the Court ultimately did not find that the redacted statements needed to be disclosed, the Court stated, "And while I do question the government's decision-making here, I think it's within the law, and that they're not required with this witness to turn over the portion of the notes that they have redacted." Trial Tr. 342:15-347:18 (quote at 347:10-13) (May 28, 2009, afternoon).

(3) On Friday, May 29, 2009, the government late disclosed additional Jencks for cooperator Russel Joseph ("Joseph"), and the Court noted that "And getting *Jencks* turned over earlier than that might help. But I know -- we're not very far into trial, so I'm not throwing stones. I'm just saying, keep in mind that you could avoid this problem." Trial Tr. 487:22-488:1 (May 29, 2009 morning)

(4) On Wednesday, June 3, 2009, the government late disclosed that Joseph gave a statement on January 17, 2006 in which he identified Tee and Steveo as the people who abducted Mr. Maharaj and that Steveo was the driver of the getaway car. Trial Tr. 1197:2-1205:16 (June 3, 2009, afternoon). The Court admonished the government, "I sure hope this is the last *Brady* problem that we have to address in the trial, and given my admonition this morning, maybe it will be. Then again, if it's not, we'll cross that bridge when we come to it." Trial Tr. 1205:13-16 (June 3, 2009, afternoon).

(5) On Tuesday, June 9, 2009, the Government conceded that it failed to give sufficient notice for the Ramadhar kidnapping for Clarke and Demerieux and was precluded from putting on that evidence. Trial Tr. 1886:5-11 (June 9, 2009, morning).

(6) On Wednesday, June 10, 2009, it came to light that the government had failed to disclose transcripts of cooperator Jason Percival ("Percival")'s grand jury testimony. Trial Tr. 2278:22-2279:25 (June 10, 2009, morning). The Court succinctly noted, "Mr. Hegyi and Ms. Miller, that's a problem." Trial Tr. 2279:5 (June 10, 2009, morning).

(7) On Thursday, June 11, 2009, it was discovered that the government had failed to disclose the evidence regarding drug dealing at Wayne Pierre's house. Trial Tr. 2476:1-19 (June 11, 2009, morning). The Court noted, "Well, everybody is advised. I do think the government would have been fairer, not to say that you've been unfair, but fairer to advise this at least yesterday so that counsel could have thought about it overnight." Trial Tr. 2479: 17-20 (June 11, 2009, morning).

(8) On Monday, June 15, 2009, after Joseph's testimony had concluded, the government produced Joseph's letters. Trial Tr. 2938:2-2944:9 (June 15, 2009, afternoon).

(9)     On Tuesday, June 16, 2009, portions of the notes of the FBI fingerprint expert were not disclosed until after the witness was off the stand. The government inquired of the witness' supervisor during her testimony, and three pages of notes were faxed and provided to Mr. Kiersch who after reviewing the notes did not object to releasing the witness. Trial Tr. 3056:23-3057:3; 3114:4-9;13-18 (June 16, 2009, morning).

(10)     On Tuesday, June 23, 2009, it came to light that the government did not have the pocket diaries or the complete file for Sgt. Lucas. Trial Tr. 4161:3-4173:5 (June 23, 2009, morning). The Court stated:

> A suspicious judge might ask of the government why Mr. Lucas – or Sergeant Lucas didn't bring more of these materials with him since they did turn out to be of interest in that issue in earlier proceedings relating to these same events.
> MR. HEGYI: And I can't answer that question.
> THE COURT: All right. I think a suspicious judge would be more specific, then, and probably say that the question isn't just why he didn't bring them, but why the government didn't ask him to bring them."

Trial Tr. 4172:17-4173:1 (June 23, 2009, morning).

(11)     On Wednesday, June 24, 2009, the government made the Court aware that they had just uncovered "a mountain of documents, rooms full of documents" that needed to be reviewed and much of which needed to be disclosed. Trial Tr. 4403:10-23 (quote at 11-12) (June 24, 2009, afternoon). The government, in the midst of an enormous error in finding a "mountain" of evidence it had failed to disclose, once again illustrated during this colloquy its fundamental misunderstanding of their *Brady* and Jencks obligations and the distinctions between them:

> THE COURT: That would include statements of Special Agent Clauss and Special Agent Cruz?
> MR. HEGYI: Cruz has not testified, but Clauss –
> THE COURT: I know he hasn't testified yet. That's *Jencks*. That's not necessarily *Brady*."

Trial Tr.4402:9-13 (June 24, 2009, afternoon).

(12)     Also on June 24, 2009, the Court was made aware of the false campsite issue. Trial Tr. 4354:7-4376:11 (June 24, 2009, morning). The Court stated, "You're cutting it too fine. You're cutting it too fine. You asked him whether he went up to the campsite. You're required to turn over material relating to his visit to the campsite." Trial Tr. 4362:11-14 (June 24, 2009, morning). The Court also noted, "I just think you're making the wrong decisions, Mr. Hegyi, and you may be making the wrong decisions that are going to be more serious than just my saying, come on, turn the stuff over and turn it over timely. You may be making wrong decisions that are threatening this case because of possible Brady or Jencks violations." Trial Tr. 4366:14-19 (June 24, 2009, morning).

(13)     On Thursday, June 25, 2009, the government failed to produce the full 302 that corresponds to Dr. Hahn's notes, and as the Court noted, even had the government not erred in omitting that critical document, the government still would not have made a timely

disclosure, "THE COURT: All right. Now, human error was made, and I understand human errors sometimes occur. I don't understand how production last night would have been consistent with my requirement that Jencks material be produced two business nights in advance." Trial Tr. 4484:6-10 (June 25, 2009, morning).

(14)     On Monday, June 29, 2009, it came to light that the government had not disclosed all of the grand jury testimony of Agent Clauss, and the Court expressed frustration with the constant failures of the government to timely disclose by saying:

> THE COURT: Enough already, Enough. Look, government, get them all to all the defense counsel. I can't deal with this kind of a mess. I can't take the time to take 10 minutes every time we have a break to talk about what they have gotten and what they haven't gotten, and what they're getting tomorrow and what they got last week. Get them all that they need to get. And there's no question that they should have gotten the grand jury testimony of Agent Clauss before now.

Trial Tr. 4876:11-18 (June 29, 2009, afternoon).

(15)     On Tuesday, June 30, 2009, it came to light that an X-ray had been taken on the skull of the decedent that revealed no fractures. The government argued that the defendants were previously on notice of the lack of fractures, and the Court highlighted that this argument reflected a misunderstanding of the prosecutors' disclosure obligations:

> THE COURT: This is back to an issue that I've raised with you before. You think *Brady* isn't invoked if there are two pieces of evidence in the government's possession, both of which are exculpatory in the same way. As long as the government produces one, it doesn't have to produce the other?"

Trial Tr. 5124:4-8 (June 30, 2009, afternoon). The Court also questioned the government putting on evidence inconsistent with the late disclosed exculpatory material:

> THE COURT: I'll have to hear more on this. I'm not going to make a ruling on it. But I will tell the government in no uncertain terms, that the list is growing longer in terms of potential problems under Brady or Jencks in this case, and that is not to the government's ultimate benefit as I look at the totality of the circumstances. If the end result here is that the government undertook to check the reliability of what Mr. Percival was telling them, in the investigatory context and through the medical testimony or investigation, that they were aware of by both Des Vignes looking at the skull for any evidence of fractures, and according to what Clauss was telling the government and the grand jury, an actual re-X-raying taking place, then it has to raise questions, perhaps not ultimately addressable in this case at this time, although perhaps so. But it has to raise questions as to why the government would choose to put in the evidence from Percival of what he thought happened based on what someone else said, when the government's investigation had at least not confirmed and perhaps refuted that.

Trial Tr. 5039:25-5040:18 (June 30, 2009, morning).

(16)    On Wednesday, July 1, 2009, the government was not permitted to elicit from Dr. Des Vignes an opinion on the actual cause of death related to the medical records because the government failed to give sufficient Rule 16 expert notice.  Trial Tr. 5477:16-5478:8 (July 1, 2009, afternoon).

(17)    On July 14, 2009, the government produced hundreds of documents for Sgt. Lucas from his pocket diary, desk diary, and other statements in his possession.  Trial Tr. 6369:15-6374:21 (July 14, 2009, morning).  The Court stated, "Well, there are two levels of issues. One is if there are Brady materials in there. The other is is this going to take them some time to do the reading."  Trial Tr. 6370:10-12 (July 14, 2009, morning).

Finally, the July 14, 2009 ruling by the Court which the government views as a sort of panacea for all its Jencks and *Brady* shortcomings explicitly stated:

> I'm not attempting to rule in general on the totality of Brady concerns that have been raised or similar concerns that have been raised, but with respect to the specific points in that supplement, which deal mainly with, mainly I stress, with an asserted inability to effectively cross-examine witnesses, I will allow, on those limited subjects raised in that supplemental filing, I will allow recall of Clauss, Gittens, Lucas and Percival on those limited subjects.

Trial Tr. 6361:12-20 (July 14, 2009, morning).  Furthermore, the defense case had begun on July 6, 2009, so it's not surprising that the government's failures to disclose documents waned after it closed its case-in-chief.

### B.    Delayed Disclosure, Cumulative Evidence, and Delayed Disclosure Affecting Trial Strategy May All Constitute Brady Violations

The government asserts that "[g]enerally, *Brady* does not apply to a delayed disclosure of information, but only to a complete failure to disclose."  Omnibus Opposition, 113.  In addition to being of questionable precedential value, *United States v. Spry* immediately after this sentence[2] correctly states the standard as "'[i]f previously undisclosed evidence is disclosed, as here, during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure."  *United States v. Spry,* 238 Fed. Appx. 142, 147 (6th Cir. 2007).  Courts

---

[2] Although this quote appears in *United States v. Spry*, 238 Fed. Appx. 142, 147 (6th Cir. 2007), it is not attributed as a verbatim quote in the government's Omnibus Opposition.

have found prejudice in delayed disclosure as opposed to total suppression. The United States Court of Appeals for the Second Circuit has stated, "[t]he opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought…[A] responsible lawyer in the midst of the pressures and paranoias of trial may well deploy scarce trial resources doing other things." *Leka v. Portuondo,* 257 F.3d 89, 103 (2nd Cir. 2001). In *Leka,* the delayed disclosure was the identity of an eyewitness, and the timing was nine days before opening, and 23 days before the beginning of the defense case. *Id.* In *Boss v. Pierce,* 263 F.3d 734 (7th Cir. 2001), the Court found a *Brady* violation where the government failed to disclose until the last day of trial "an investigative report summarizing an interview of [a defense alibi witness] conducted four days before the trial began" in which the witness stated that the government's witness was bragging that he had committed the crime for which defendant was on trial. *Boss v. Pierce,* 263 F.3d 734, 737-38 (7th Cir. 2001).

The government further asserts that suppression of cumulative impeachment is not generally a *Brady* violation. Aside from the irrelevance of this argument since Clarke is not arguing a general proposition, the material at issue that the government failed to timely disclose was not cumulative impeachment material. In direct contradiction to the government's stated argument, the state of the law is actually not a bright line rule. Rather, the Court must evaluate on a case-by-case basis whether the "defendant…[can] show a reasonable probability that an earlier disclosure would have changed the trial's result" which Defendant has. *United States v. Dean,* 55 F.3d 640, 663 (D.C. Cir. 1995). The government's assertion that timely disclosure for impeachment evidence is always at trial is not supported by the case law it cites which holds there was no violation of *Brady* with regard to the material at issue in those specific cases – the cases do not hold generally, that disclosure of impeachment evidence is timely if made at trial.

In *United States v. Tarantino,* cited by the government, the Court decided no *Brady* violation occurred due to delayed disclosure because they found that earlier disclosure would not have led to a better cross-examination and the jury heard the defendant's arguments about the inconsistencies. *United States v. Tarantino,* 846 F.2d 1384, 1417 (D.C. Cir. 1988). Furthermore, the statements at issue in *Tarantino* were timely disclosed pursuant to the Court's Jenck's rule of production 48 hours prior to the witness' testimony, in contrast to the pattern of late Jencks disclosures by the government in this case. *Id.* at 1416. In *United States v. Balistrieri,* the Court noted that the appropriate standard to evaluate late disclosed evidence under *Brady* is as follows, "[t]he late production of exculpatory evidence during trial is reversible error only if there is a reasonable probability that, had the evidence been timely disclosed to the defense, the result of the trial would have been different." *United States v. Balistrieri,* 779 F.2d 1191, 1222 (7th Cir. 1985). The Court's ultimate finding that the late disclosure in *Balistrieri* did not rise to the level of a *Brady* violation does not support the government's argument that "it is well-settled that with regard to exculpatory evidence, that is solely of an impeaching nature, disclosure at trial satisfies the Government's obligations." Omnibus Opposition, 112.

The government's argument that delay in disclosure that affects defense trial preparation, strategy and tactics does not constitute *Brady* ignores the mandate of Brady that "[d]isclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure" *United States v. Pollack,* 534 F.2d 964, 973 (D.C. Cir. 1976) (holding no *Brady* error for disclosure one day before trial). Moreover, "[t]he opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought." *Leka v. Portuondo,* 257 F.3d 89, 103 (2nd Cir. 2001).

The *Leka* Court noted, "the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use." *Id.* at 100.

The government's arguments misstate the appropriate standard the Court should use in evaluating Defendant's claims under *Brady* and Jencks.   The correct standard for delayed disclosure is whether Defendant has shown "that 'had the statements been disclosed earlier, there is a probability sufficient to undermine our confidence in the actual outcome that the jury would have acquitted.'"   *United States v. Wilson,* 160 F.3d 732, 742 (D.C. Cir. 1998) (citations omitted).

### C.  The Prejudicial Effect of the Late Disclosures Constitutes a *Brady* Violation.

Prejudice resulted from government's dilatory disclosure of these items in violation of their obligations under *Brady.*  The government late disclosed the *Brady* material of Joseph's January 17, 2006 statement in which he identified Tee and Steveo as the abductors and Steveo as the driver of the getaway car.  The late disclosure of this information was prejudicial because earlier disclosure could have led to investigation and other exculpatory evidence.  Earlier disclosure also could have led to emphasis by the defense that the cooperators were all coordinating their stories, since Joseph's initial statement different from his later statements. The government argues that the late disclosed initial statement constituted lies and the later statements were the truth.  Omnibus Opposition, 79 ("Mr. Joseph *quickly recanted* in his second statement to TTPS the participation of the *imaginary* "T," and thereafter steadfastly maintained the two gunmen who abducted Balram Maharaj were Mr. Sealey ("Boyie") and Mr. Nixon ("Shaka")").  Such a characterization "presumes the truth of the version of events [given]…on the witness stand – the very issue at the heart of [the]…trial."  *United States v. Rodriguez,* 496 F.3d 221, 228 (2nd Cir. 2007)(remanding to District Court for hearing on whether government's

failure to disclose with specificity lies told by cooperating witness constituted *Brady* violation under material standard).  It may be true that Joseph "eventually came to characterize…[the] initial statement[] as lies and…subsequent statements incriminating the defendants as the truth.  But…[he] began by characterizing the initial statements as the truth, apparently denying, at least by implication, what…[he]later testified to."  *Id.* at 228.  The *Rodriguez* Court noted, "It is at least possible that the initial statements were the truthful ones, and that…later testimony was a falsification designed to serve…[his] interests as a cooperator."  *Id.* at 228.  The government's belief that Tee is imaginary and that Joseph recanted his original lies ignores the fact that Joseph, like the cooperating witness in *Rodriguez* "began by characterizing the initial statements as the truth, apparently denying, at least by implication, what [he] later testified to."  *Id.*

Another *Brady* late disclosure was the evidence that there was drug dealing at Pierre's house.  This late disclosure was prejudicial because had the defense known earlier, it would have emphasized, during opening statements and throughout the trial, that the defendants knew each other and contacted each other related to drug dealing rather than kidnapping.  This information also would have had an impact on severance arguments since the prejudice of the testimony would have been greater for certain defendants and it would have led to opposing defense strategies.

### D.  The False Campsite Issue

This section will set forth the following: First, the government's withholding of documentary evidence that reflected its belief that the campsite was false prejudiced Clarke, immaterial of whether Clarke or counsel had knowledge of the underlying fact that the campsite was false.  Second, the knowledge argument put forth by the government is a red herring and a poor excuse for their failure to abide by their constitutional obligations.  Finally, the government

has made different – all equally insufficient – excuses for failing to disclose this evidence, which the Court has rejected once already and should reject again.

### i. Prejudice

The documentary evidence withheld until the middle of trial by the government demonstrating the government's belief this was the false campsite is exculpatory. In the Omnibus Opposition, the government argues that it would not be possible for this evidence to "have substantially altered the jury's view of Defendant Clarke's involvement in the conspiracy." Clarke Motion for a New Trial, 21. The Omnibus Opposition states, "[p]erhaps charitably, Mr. Clarke's Motion does not attempt to explain how that would be possible." Omnibus Opposition, 17. The defense theories in this case were that cooperator Jason Percival was orchestrating the story of the cooperators for his own benefit and fabricating or overstating the role of the defendants, and that the Trinidadian police suggested or told Defendant what to say during his "confession," and Clarke is a follower, not a leader, who did not voluntarily agree to participate in the conspiracy.

Had the government obeyed the Court's orders – or their U.S. Attorneys Manual[3] or their constitutional obligations to comport with due process – and disclosed the documentary evidence that the campsite was false in time for the defense to make use of it, Defendant could have worked this evidence into the defense theory. The false campsite evidence would have been woven into the defense theory through, inter alia, arguments that Clarke was instructed by the Trinidadian police to say that he guarded Mr. Maharaj at a campsite in the jungle, he dutifully – as a follower, not a leader – relayed that information to the FBI in a series of "confessions" and

---

[3] USAM 9-5.001(D)(1) states, "Exculpatory information must be disclosed reasonably promptly after it is discovered." United States Attorneys Manual (available: http://www.justice.gov/usao/eousa/foia_reading_room/usam/)

when it arose, took the FBI to *a* campsite in the jungle.  The fact that Mr. Clarke brought the FBI

to a false campsite is evidence that he did not know where the real campsite was.  This is the

type of argument that could have been made that was made impossible because of the late

disclosure of the documentary evidence by the Government.  The government argues that Clarke

belittles the stipulation reached and read to the jury that the campsite was false.  Omnibus

Opposition, 128.  The stipulation was a less than ideal mid-trial remedy reached to salvage some

hope of using the information when thrust upon Defendant mid-trial.  Late disclosure of evidence

"tend[s] to throw existing strategies and preparation into disarray," and it can be "difficult…to

assimilate new information, however favorable, when a trial already has been prepared on the

basis of the best opportunities and choices then available."  *Leka v. Portuondo,* 257 F.3d 89, 101

(2nd Cir. 2001).

In *Cone v. Bell,* a defendant, who unsuccessfully mounted an insanity defense based on

drug abuse in a capital case, learned during post-conviction proceedings that the prosecution,

which had argued at trial and sentencing that defendant's claim that he was a drug user was

"baloney", suppressed evidence that government witnesses had described defendant as "high"

immediately before the crimes and that law enforcement personnel referred to defendant as a

"heavy drug user" in police bulletins.  *Cone v. Bell,* -- U.S. --, 129 S.Ct. 1769, 1777 (2009)

(remanding to determine materiality for sentencing).  One of the government witnesses in *Cone,*

a police officer Roby, testified "that Cone had no needle marks on his body when he was

arrested" despite Roby having "authorized multiple teletypes to law enforcement agencies in the

days following the murders in which he described Cone as a 'drug user' and a 'heavy drug

user.'"  *Id.* at 1783.  The *Cone* Court notes, "Roby did not testify directly that Cone was not a

drug user…Taken in context, Roby's statement that he had not observed any needle marks on

Cone's body invited the jury to infer that Cone's self-reported drug use was either minimal or contrived. Therefore, although the suppressed evidence does not directly contradict Roby's trial testimony, it does place it in a different light." *Id.* at 1784, n.17.

The government argues that "the Government never *represented* the campsite to which Mr. Clarke led the FBI and TTPS *was* the true campsite. Rather, the Government merely introduced testimony that *Mr. Clarke promised* to take authorities to the campsite where the victim was held and thereafter Mr. Clarke took authorities *to a campsite.*" Omnibus Opp, 139 (emphasis original). The government's argument is akin to the argument explicitly rejected by the *Cone* Court that "Roby did not testify directly that Cone was not a drug user" because like in *Cone v. Bell,* "although the suppressed evidence does not directly contradict…[the] trial testimony, it does place it in a different light." *Cone v. Bell,* 129 S.Ct. 1769, 1784, n.17. Just as in *Cone v. Bell,* "[t]aken in context, Roby's statement that he had not observed any needle marks on Cone's body invited the jury to infer that Cone's self-reported drug use was either minimal or contrived," so too did the government's eliciting of testimony that "*Mr. Clarke promised* to take authorities to the campsite where the victim was held and thereafter Mr. Clarke took authorities *to a* campsite" as the government described the testimony, when "[t]aken in context…invited the jury to infer" that Mr. Clarke had led the authorities to the campsite where the decedent was held. As the Court stated with regard to whether it was clear that the campsite testimony referred to a false campsite, "I didn't know it. I believe the jury was confused with respect to it." Trial Tr. 4382-83: 24-1, June 24, 2009. So, the government's assertion that it "never affirmatively represented that this was the correct campsite" misses the point because the government's representations and the testimony "invited the jury [and counsel and the Court] to infer" that the

campsite to which Mr. Clarke led law enforcement authorities was the campsite at which Mr. Maharaj was held.[4]

## ii. Knowledge

The government's argument that knowledge of the defendant defeats their *Brady* obligations reflects a misunderstanding of the obligations imposed by *Brady* and its progeny. The very premise of the *Brady* doctrine is that a defendant who knows the fact of his own innocence is still entitled to specific or documentary evidence in the possession of the prosecutor regarding that fact. In *In re Sealed Case No. 99-3096 (Brady Obligations),* the government failed to search for or disclose cooperation agreements of a defense witness who during trial flipped and testified against the defendant. *In re Sealed Case No. 99-3096 (Brady Obligations),* 185 F.3d 887 (D.C. Cir. 1999). The government argued that the cooperation agreements of the witness were "otherwise available through 'reasonable pre-trial preparation by the defense,'" and the *In re Sealed Case* Court noted, "we find this argument somewhat surprising. The

---

[4] These are some of the references to the campsite: "(BENCH CONFERENCE)…MS. MILLER: No, no. I just want to get to the fact that the next day he went with Clarke and the others and found the campsite." Trial Tr. 4230:24 – 4231:1 (June 23, 2009, afternoon)
"AGENT CLAUS: We went to the Santa Cruz forest. Again, it was myself, Agent Cruz, the Trinidad police, and Zion Clarke. Zion Clarke led us through a path up into the forest, and identified a location in which there was two makeshift shelters that were constructed in the forest. And that's where he told us that the victim was held at while he was guarding him back in April of 2005." Trial Tr. 4239:25 – 4240:6 (June 23, 2009, afternoon).
"AGENT CLAUS: After having personally gone with Mr. Clarke to the location that he showed us where they held the victim, I believed that was not feasible to do." Trial Tr. 4244:19-21 (June 23, 2009, afternoon).
"AGENT CLAUS: We're talking about two different dates here, sir. What you're referring to now is January 6th when Mr. Clarke took us to the campsite, if you will, where the two shelters were." Trial Tr. 4339:22-24 (June 23, 2009, afternoon).
"MR. CARNEY: Photographs were taken by both sides, you and the Trinidad people? AGENT CLAUS: Of the campsite? Yes, I believe that's correct." Trial Tr. 4340:9-11 (June 23, 2009, afternoon).
"MS PENDRY: And you understood that to be the area where Mr. Maharaj was held for a number of days. Correct? AGENT CLAUS: Yes." Trial Tr. 4348 14-16 (June 23, 2009, afternoon).

government concedes that it has not yet conducted a full *Brady* search of its own, and hence does not know the details of any agreements [the witness] may have had" and the Court went on, "We do not understand how the government can confidently assert that defense counsel could have learned the contents of [the witness'] agreements when the government concedes that it has no idea what those contents are." *In re Sealed Case No. 99-3096 (Brady Obligations),* 185 F.3d 887, 896 (D.C. Cir. 1999). Similarly, the government makes much of the knowledge of Clarke and counsel but argued on the record when the disclosure occurred that the government was not aware it possessed the evidence. Trial Tr. 4365:25-4366:1 (June 24, 2009, morning).

Knowledge of a defendant of the existence of a fact does not defeat the government's *Brady* obligations to disclose evidence supporting that fact. In *United States v. Severdija,* a boat was boarded by the Coast Guard twice – the first time during which the captain told the ensign that he was going to get a disabled vehicle, that he did not know his crew, and that he expected a vessel with marijuana to come into the area soon so the Coast Guard should remain – and the second time the captain told the Coast Guard that there was marijuana aboard his ship from the disabled vehicle that was being towed and the captain was arrested. *United States v. Severdija,* 790 F.2d 1556, (11th Cir. 1986). The government failed to disclose "the identity of Ensign Barker …[or] the contents of his report…until after the jury had returned its verdict." *Id.* at 1559. Following the grant of a new trial, the government appealed and argued, "that as Severdija was certainly aware of any statements he had made to Ensign Barker…he could have in the exercise of due diligence obtained all the reports of the boarding, and thus obtained Barker's report." *Id.* at 1559. The *Severdija* Court also rejected any inference drawn from the defendant testifying without reference to the statement.

> Even though Severdija must be assumed to have known of his own statement, in the absence of any means of corroborating his claim to have made it jurors might

well have disbelieved him and held the falsity of his testimony against him.  It is conceivable that Severdija recognized the possible detrimental effect of such an uncorroborated self-serving statement and thus refrained from raising the statement before the jury.  Regardless of the reason for the lack of reference to the statement at trial, had Severdija known that this testimony could have been corroborated it is highly likely that it would have been given.

*United States v. Severdija,* 780 F.2d 1556, 1559, n.1 (11th Cir. 1986).  The *Severdija* Court explained the critical difference between the defendant's awareness of making the statement and the evidence that was not disclosed by the government, "The evidence at issue, however, is not Severdija's statement; rather Ensign Barker's recordation of those statements.  There is no evidence that Severdija knew of such a recordation….Without the crucial written statement, Severdija would have been at the mercy of Barker's memory."  *Id.* at 1559-60.  Similarly, here, the "evidence at issue…is not" Defendant or counsel's knowledge that the campsite was false, but it was the documentary evidence that reflected the government's belief that the campsite was false and, "[t]here is no evidence that [Clarke] knew of such" evidence.  *Id.*  Also as the *Severdija* Court noted in relation to the defendant's failure to testify to the statement, cross-examination of Agent Clauss without the documentary evidence would have been "in the absence of any means of corroborating his claim."  *Id.*  at 1559 n.1.  The government's failure to timely disclose the evidence regarding the false campsite that Defendant could have used at trial was error that prejudiced Defendant Clarke.

Regardless of whether Clarke or counsel had knowledge that the campsite was false, the prosecutors in this case still were obligated to provide specific or documentary evidence in their possession regarding this fact. In *Owens v. Guida,* 549 F.3d 399 (6th Cir. 2009) (Merritt, J., dissenting), Judge Merritt, who dissented from the Sixth Circuit decision ultimately reversed by *Cone v. Bell,* also dissented in another *Brady* case where the prosecution suppressed love letters between a husband and one of his mistresses in a case where a wife was charged with the capital

crime of murder for hire of her husband. *Owens v. Guida,* 549 F.3d 399 (6th Cir. 2009) (Merritt, J., dissenting). Judge Merritt's dissent stated, "The majority argues that if a defendant has knowledge of any fact, or a reasonable suspicion of a fact, that defendant is not entitled to exculpatory evidence regarding that fact because she could testify regarding that fact herself….The majority's proposed rule is nonsense." *Owens v. Guida,* 549 F.3d 399, 425 (6th Cir. 2009) (Merritt, J., dissenting). The dissent also argues that, under this theory, the defendant in *Brady v. Maryland,* himself would not have been entitled to "any documentary evidence in the hands of the prosecution that would support any knowledge that Brady already had" because Brady "had knowledge that he did not kill the victim, but had no documentary evidence to support that knowledge or to support his view of the identity of the real culprit." *Id.* "This argument is directly contrary to the Supreme Court's holding in *Brady*. The Court specifically held that Brady's knowledge that his co-defendant committed the crime obviously did not satisfy the prosecution's responsibility to provide specific information that it had regarding the co-defendant's guilt." *Id.* Similarly, here, even assuming *arguendo* that Mr. Clarke and counsel had knowledge that the campsite was false, that "knowledge…obviously did not satisfy the prosecution's responsibility to provide specific information that it had regarding" the false campsite.

### iii. Government's Excuses

First, the government during discovery discloses photographs of the false campsite without revealing their belief or the evidence that supports the belief that the campsite is false. Then at trial, the government elicits testimony and fails to correct testimony brought out on cross-examination of Agent Clauss that left the Court, other defense attorneys, and in all likelihood the jury, with the impression that the campsite was where Mr. Maharaj was held.

When it comes to light based on another 302 that the government had not seen[5] and turned over – following many warnings from the Court – the government tried to argue that it was not obligated to disclose the material.  This argument reflects a previous decision made by the government whereby it reviewed the material and decided not to produce it.  First, the government argued it was not Jencks because no probing questions regarding evidence recovered from the campsite were asked on direct examination.  Once the Court rejected that argument, the government asserted that it was unaware the material was in its possession.  Finally, the government submitted the excuse, "Your Honor, I don't mean to be saying it's not whoops.  It is a whoops."  Trial Tr. 4374:9-10 (June 24, 2009, morning).  Now, in its Omnibus Opposition, the government is back to the argument that they had no obligation to disclose the evidence because defendant and counsel knew.

The government strains to argue that there was no need to disclose the suppressed information as Jencks because the government on direct did not elicit testimony about whether Agent Clauss collected evidence or took measurements, so that material was not Jencks.  The government's position that because they did not ask Agent Clauss certain probing questions about the campsite, that the suppressed evidence was not Jencks demonstrates a misunderstanding of Jencks.  One of the purposes of the Jencks rule is to give the defendant the opportunity to impeach witnesses with prior inconsistent statements regarding their testimony.  As the Court said, "You're cutting it too fine.  You're cutting it too fine.  You asked him whether he went up to the campsite.  You're required to turn over material relating to his visit to the campsite."  Trial Tr. 4362:11-14 (June 24, 2009, morning).  The government persists in arguing

---

[5] The government's poor organization of files such that moving them from one room at their office to another utterly disrupted their timely provision of Jencks and *Brady* or even their awareness of what had and had not been disclosed is a wholly insufficient excuse for failure to make proper disclosures and record what has and has not been disclosed to the defendants.

that there was no confusion about whether the campsite testimony referred to the false or real campsite.  As the Court stated with regard to whether it was clear that the campsite testimony referred to a false campsite, "I didn't know it.  I believe the jury was confused with respect to it."  Trial Tr. 4382: 24-4383:1, June 24, 2009.  If not for the confusion generated by the testimony about the campsite, there is little conceivable reason the government would have elicited such irrelevant testimony that the FBI was led to a false campsite.

The government then argued that the failure to disclose was inadvertent, but that argument is belied by the record in this case:

- MR. HEGYI: So I don't know that we had any obligation to tell anybody in this case that they went up to a campsite, and now this the wrong campsite.  Trial Tr. 4365:10-12 (June 24, 2009, morning).
- MR. HEGYI:  There's another reason for it, Your Honor.  Because the complaint that the items that were collected there, why didn't we highlight that.  Well, the items were collected.  They were sent off.  Everything was negative.  There's no DNA, there's no hair, there's no fingerprints.
  THE COURT:  But there was testing done on it.
  MR. HEGYI:  There was testing done on it.
  THE COURT:  And you haven't provided that to the defense.
  MR. HEGYI:  I have now provided it to the defense.  But all of that was negative.  And it wouldn't have been – it can't – in our opinion it can't have been any type of a Brady issue in any event, because even if, just say that there was some DNA of another person and there wasn't, that doesn't mean that these people – that doesn't exculpate any of these people.  4364:13 - 4365:2 (June 24, 2009, morning).

The Court's rejection of these arguments led the government to next argue the excuse that it was not aware of the diagram, but that argument too was quickly rejected:

THE COURT: But they say -- the prosecutors say they
weren't aware of that either.
MR. O'TOOLE: I heard that. But the government, you
know, under Brady, it doesn't matter whether the prosecutors are
aware of it or not, or whether it's inadvertent or intentional.
THE COURT: True enough.

Trial Tr. 4367:24-4368:4 (June 24, 2009, morning).    Finally, at the Court's urging, the government stated that "It is a whoops."  Trial Tr. 4374:9-10 (June 24, 2009, morning).

Whether an inadvertent "whoops" or a conscious decision, the myriad Jencks and *Brady* violations perpetrated by the government in this case had a prejudicial effect on Defendant Clarke that warrant the imposition of sanctions. When "multiple *Brady* violations are at issue, the question…is whether the 'cumulative effect of all such evidence suppressed by the government…raises a reasonable probability that its disclosure would have produced a different result.'" *United States v. Sipe,* 388 F.3d 471, 491 (5th Cir. 2004). Here, by the end of the trial it was clear that by the pattern of withholding that this was how the government chose to conduct this trial.[6] The cumulative effect of the *Brady* violations in this case meet this standard because the evidence regarding Clarke's guilt that had been suppressed – his knowledge of the location of the campsite, his contacts with the co-defendants, and the cooperators' knowledge of the details of the plan – would have been cast in a much different light, one that would have raised reasonable doubt. Additionally, the Jencks violations rose to the level that sanctions are appropriate because the negligence of the government was severe, the evidence suppressed was crucial and would have undermined the other evidence of guilt as previously outlined.

## IV. SEVERANCE/CO-DEFENDANTS' STATEMENTS

The government argues that Clarke's arguments for severance based on the admission of improperly redacted statements of testifying co-defendants were made "[w]ithout identifying any legal authority supporting his proposition." Omnibus Opposition, 21. To the contrary, Clarke's Motion for New Trial cited to the leading Supreme Court cases on this issue, *Bruton v. United States,* 391 U.S. 123 (1968), *Gray v. Maryland,* 523 U.S. 185 (1998), and *Richardson v. Marsh,* 481 U.S. 200 (1987). Furthermore, the government mis-states that "Mr. Pierre presents the only

---

[6] In this Reply, Defendant argues that the appropriate sanction is granting Clarke's Motion for New Trial. Though this sanction is appropriate, Defendant's argument here in no way limits other arguments for sanctions for the government's failures to comply with the Court's orders and disclose Jencks and *Brady* materials.

post-trial filing claiming entitlement to severance because of the statements of his co-defendants." Omnibus Oppositin, 104.  Clarke's Motion for New Trial argued that severance had been improperly denied and Clarke's constitutional rights were violated by a joined trial in which the co-defendants' statements were admitted without proper redaction.  In addition to the Supreme Court, other courts have held that substitution of a defendant's name can violate the *Bruton* prohibition.  In *United States v. Richards,* the substitution of the word "friend" or "my friend" for the defendant's name was found to be error, though not reversed since evaluated on a plain error standard.  *United States v. Richards,* 241 F.3d 335 (3rd Cir. 2001).  In *Timberlake v. Taylor,* the court noted that substitution of "words like 'a guy' or 'another guy' in a non-testifying co-defendant's statement presented a situation "materially indistinguishable from the facts in *Gray [v. Maryland].*"  *Timberlake v. Taylor,* No. 04 Civ. 2846, 2008 WL 756160 (S.D.N.Y. March 20, 2008) (finding *Bruton* error but holding it harmless because of overwhelming evidence of guilt).

## V.  UNDULY PREJUDICIAL GORY EVIDENCE AND OTHER CRIMES

On page 129-130 of its Omnibus Opposition, the government sets forth "some of the overwhelming evidence at trial of Mr. Clarke's guilt" without reference to any transcript citations.  On Page 130, the government lists among this list of evidence of guilt "Mr. Clarke's involvement in other kidnappings for ransom" which directly supports Clarke's argument that the other crimes evidence was admitted for the improper purpose of propensity.  Further on page 130 of the Omnibus Opposition, the government states that among the list of the evidence of guilt is "his [Mr. Clarke's] enthusiastic role in the dismemberment of the victim."  Omnibus Opposition, 130.  This reference underscores Clarke's argument that the government improperly used grotesque evidence to unfairly prejudice Mr. Clarke.  The grotesque evidence permeated the

trial, from opening to closing.  In the opening statement, the government twice referred to the dismemberment, saying Clarke "took a machete and chopped his body into pieces" so that "when his body was recovered more than six months later, it was largely decomposed mush and skeleton" and that defendants "marched up into the jungle with a machete and…dismembered Mr. Maharaj and buried him in the jungle."  Trial Tr. 25:20-26:4 (May 27, 2009, morning); Trial Tr. 31:3-8 (May 27, 2009, morning).  Russel Joseph's testimony included many gory details.  Trial Tr. 736:18-738:20 (June 2, 2009, morning).  Joseph testified that Mr. Clarke "went in with his hands, he took out the organs and intestines and put it into the white Styrofoam cooler"  Trial Tr. 737:24-738:1 (June 2, 2009, morning).  In closing argument, the government makes four references to the chopping up of the body:  Trial Tr. 7604:9-24; 7659:14-15; 7633:20-7634:4; 7615:10-7616:9 (July 23, 2009, morning).  Most notably, the government pointed to Mr. Clarke when he stated, "And that man right there took his organs out with his bare hands."  Trial Tr. 7604:16-17 (July 23, 2009, morning).  Clarke incorporates and renews the arguments made in Clarke's Motion for New Trial.

## VI. IMPROPER PROSECUTORIAL VOUCHING

The government argues in its Omnibus Opposition that it was not improperly vouching for the credibility of the cooperating witnesses, but rather explaining what the cooperators believed their obligations to be.   The Omnibus Opposition emphasizes that the impropriety of prosecutorial vouching rests, in part, on the reliance by prosecutors on material outside the record.  Omnibus Opposition, 143.  If that were the case, the government likely would have used words like "The cooperators believed…" or "In their minds," to preface the inappropriate comments that were made during closing and rebuttal arguments.  The government's argument falls flat in light of the comment they failed to address regarding Agent Cruz and Clauss where –

as with the other comments – the government was impermissibly arguing that the witnesses were telling the truth because there was too much at stake for them to lie.

## VII.    CONCLUSION

The errors committed during this trial – preventing the defense from challenging the government's evidence regarding citizenship, the extensive *Brady* and Jencks violations, the improperly redacted co-defendant statements implicating Clarke, the undue prejudice from the grotesque dismemberment evidence and other crimes evidence, and the prosecutors' improper vouching for witnesses – warrant the grant of a new trial.

**WHEREFORE,** for the foregoing reasons, those stated in the Clarke's Motion for New Trial and any other reasons the Court may find, defendant respectfully requests this Honorable Court grant a new trial.

Respectfully submitted,

/s/ Jeffrey B. O'Toole
Jeffrey B. O'Toole
D.C. Bar No. 244509
Counsel for Zion Clarke
O'Toole, Rothwell, Nassau & Steinbach
1350 Connecticut Avenue, N.W., Suite 200
Washington, D.C. 20036
(202) 775-1550
(202) 775-0008 facsimile
otoole@otrons.com

## CERTIFICATE OF SERVICE

I, Jeffrey B. O'Toole, do hereby certify that I have served a copy of the foregoing Reply to Omnibus Opposition of the United States to Defendants' Post-Trial Motions, upon Bruce Hegyi, Esq., and Jeanne Hauch, Esq., Assistant United Stated Attorneys representing the Government in this case, and all counsel of record electronically via PACER this 12th day of March, 2010.

_____/s/_____
Jeffrey B. O'Toole